Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

---

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| CAMERON JAMES WILSON, | Case No. 1:25-cv-03038-MKD |
| Plaintiff, *in propria persona*, | |
| | **PLAINTIFF'S OPPOSITION TO** |
| v. | **DEFENDANTS' MOTION FOR** |
| | **SUMMARY JUDGMENT** |
| TROOPER SCHOENBORN, individually; | |
| SGT. HOVINGHOFF, individually, | NOTE ON MOTION CALENDAR: |
| Defendants. | [DATE TO BE SET BY COURT] |

## I. INTRODUCTION: THE PHILOSOPHICAL AND LEGAL FOUNDATION

Defendants' Motion for Summary Judgment rests upon a foundation of legal mischaracterization, factual distortion, and constitutional error so fundamental as to render the motion legally untenable. Defendants ask this Court to hold, as a matter of law, that two Washington State Patrol troopers acted constitutionally when they: (1) converted a voluntary welfare check into a coercive, warrantless detention of an individual who was lawfully parked in a designated area with his vehicle's engine off; (2) demanded identification from a person who had committed no traffic infraction and was not operating any vehicle—a fact explicitly acknowledged on scene by Defendant Hovinghoff, who stated they would not cite for traffic violations because they did not observe Plaintiff driving; (3) arrested that person for "failure to identify"—a charge that the prosecuting authority dismissed upon initial review, providing powerful corroborating evidence of the absence of probable cause; (4) failed to make any reasonable accommodation for that person's known, visible disability as a below-the-knee amputee; (5) seized that person's cellular telephone without a warrant while he was exercising his First Amendment-protected right to record a public law enforcement encounter; and (6) subjected that person to a detention and arrest motivated, at least in part, by retaliatory animus

Page 1

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

___

for his constitutionally protected speech.[1]

The fundamental rights asserted herein derive not from governmental grant, but from the inherent dignity and liberty of the individual as endowed by their Creator. The United States Constitution and the Washington State Constitution recognize, but do not create, these fundamental rights. As the Declaration of Independence proclaims, governments are instituted among men to *secure* these rights—not to bestow them. The procedural remedies sought by Plaintiff are mechanisms to protect these pre-existing natural rights against governmental overreach. Defendants' conduct represents a profound failure to respect the limited nature of governmental power and the equal dignity of all persons before the law.[2]

Plaintiff Cameron James Wilson respectfully submits that the foregoing course of conduct presents genuine disputes of material fact on every claim asserted in the Second Amended Complaint, that qualified immunity does not shield Defendants from liability for violations of clearly established constitutional and statutory law, and that Defendants' motion must therefore be denied in its entirety.

## II. STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

Pursuant to Fed. R. Civ. P. 56(c) and Local Rule 56(c), Plaintiff identifies the following genuine disputes of material fact that preclude summary judgment:

1. **Nature of the Encounter.** Defendants characterize the initial contact as a lawful investigative stop. Plaintiff disputes this characterization and asserts that the encounter was a voluntary welfare check—a consensual encounter—that Plaintiff declined, after which Defendants had no constitutional authority to detain him. Defendants' own sworn declarations confirm the officers stated it was a "welfare check." *See* Schoenborn Decl. ¶4; Hovinghoff

___

[1] Plaintiff's Second Amended Complaint ("SAC") asserts claims under 42 U.S.C. § 1983 (Fourth Amendment, First Amendment, Fourteenth Amendment), Title II of the Americans with Disabilities Act (42 U.S.C. § 12132), Section 504 of the Rehabilitation Act (29 U.S.C. § 794), and Washington state law.

[2] The natural law tradition upon which the American constitutional order is founded holds that *lex iniusta non est lex*—an unjust law is no law at all. *See* St. Thomas Aquinas, *Summa Theologica*, I-II, Q. 95, Art. 2. The arrest of Plaintiff for a non-existent crime, in derogation of his Creator-endowed liberty, exemplifies the type of governmental overreach that the Framers sought to prevent.

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

Decl. ¶3.[3]

2. **Whether Wilson Was "Operating" a Vehicle.** Defendants assert the encounter arose from a traffic investigation. Plaintiff disputes this and asserts that his vehicle was parked in a designated area with the engine off for approximately five minutes prior to the encounter, and that he had exited the vehicle to relieve himself. No traffic infraction was occurring. The mere presence of a person in the driver's seat of a parked, non-operating vehicle does not establish "operation" of a vehicle within the meaning of any applicable statute.

3. **Whether Any Traffic Infraction Occurred.** Defendants claim the license plate cover provided reasonable suspicion. Plaintiff disputes this and asserts that his vehicle was registered in the State of Oregon, and that RCW 46.16A.160(1)(b) expressly exempts out-of-state registered vehicles from Washington's license plate cover requirements. Schoenborn himself acknowledged the Oregon registration in his interrogatory responses.[4] Furthermore, Defendant Hovinghoff explicitly admitted on scene that they would not cite Plaintiff for traffic violations because they did not observe him driving.

4. **Whether Defendants Knew of Plaintiff's Disability.** Defendants assert they were unaware of Plaintiff's disability until after force was applied. Plaintiff disputes this. Schoenborn's own sworn Investigation Report states: "The subject stated he was an amputee." Hovinghoff admitted in his Requests for Admission that he heard Plaintiff state he was "disabled" and had "one leg" before any physical force was applied. *See* Hovinghoff RFA Resp. Nos. 25, 30.

5. **Whether Plaintiff's Conduct Constituted "Abnormal Behavior" Justifying Detention.** Defendants and their expert assert that Plaintiff's behavior was "abnormal." Plaintiff disputes this characterization and asserts that his movements were entirely consistent with those

---

[3]The distinction between a consensual encounter and an investigative detention is a question of law that turns on disputed facts—specifically, whether a reasonable person in Plaintiff's position would have felt free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

[4]The license plate cover argument is a *post hoc* rationalization. Even if the cover were technically non-compliant, the exemption for out-of-state vehicles eliminates the predicate for any traffic-based detention.

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

of a single lower-extremity amputee using a prosthetic device, and that any perceived "abnormality" was a direct manifestation of his disability—not evidence of criminal activity or intoxication.

6. **Whether Plaintiff's Refusal to Engage Provided Reasonable Suspicion.** Defendants assert Plaintiff's refusal to cooperate contributed to reasonable suspicion. Plaintiff disputes this as a matter of clearly established constitutional law: a citizen's refusal to cooperate with a voluntary encounter does not, standing alone, provide reasonable suspicion of criminal activity. *Florida v. Bostick*, 501 U.S. 429, 437 (1991).

7. **Whether Probable Cause Existed for Arrest.** Defendants assert probable cause existed based on "failure to identify." Plaintiff disputes this and asserts that RCW 46.61.021 applies only to persons stopped for a traffic infraction, that no traffic infraction occurred, and that the prosecution's dismissal of all charges upon initial review is powerful corroborating evidence that no probable cause existed.[5]

8. **Whether Plaintiff's Phone Was Seized Unlawfully.** Defendants assert the phone seizure was incident to a lawful arrest. Plaintiff disputes this and asserts the seizure occurred without a warrant, without exigent circumstances, and was motivated by retaliatory animus for Plaintiff's exercise of his First Amendment right to record the encounter.

9. **Whether Defendants Provided Reasonable ADA Accommodations.** Defendants assert they acted reasonably with respect to Plaintiff's disability. Plaintiff disputes this and asserts that no medical evaluation was requested, no accommodation was offered, and that Plaintiff's disability-related movements were affirmatively characterized as "resistance" justifying escalating force.

10. **Whether Defendants Used Excessive Force.** Defendants assert that the force applied was reasonable. Plaintiff disputes this and asserts that the force used against a non-threatening,

---

[5]The prosecutorial dismissal is not merely a procedural formality—it is an independent legal officer's determination that no crime was committed. *See Borunda v. Richmond*, 885 F.2d 1384, 1389 (9th Cir. 1988).

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

___

non-fleeing, disabled individual who was seated in a parked vehicle was objectively unreasonable under the *Graham v. Connor* factors, particularly given the failure to account for his known disability.

# III. LEGAL STANDARD

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

At the summary judgment stage, the Court must view all facts and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court may not weigh evidence or make credibility determinations. *Anderson*, 477 U.S. at 255. Furthermore, where video evidence exists, the Court must view the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).[6]

In civil rights cases brought under 42 U.S.C. § 1983, the summary judgment standard is applied with particular care, as "the issues in such cases frequently involve disputed facts and the credibility of witnesses." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam). The Supreme Court has specifically admonished that courts must not "fail to adhere to the specifics of the summary judgment standard" in excessive force and civil rights cases. *Id.* at 657.

Because Plaintiff proceeds *in propria persona*, his pleadings and filings must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed.") (citation omitted); *Haines v. Kerner*, 404 U.S. 519, 520 (1972). This liberal construction extends to the summary judgment stage. *Blaisdell v. Frappiea*, 729 F.3d 1237, 1241 (9th Cir. 2013).

___

[6]The body camera footage in this case is critical. Under *Scott*, the Court must credit the video evidence over Defendants' self-serving declarations where the two conflict.

Page 5

Wilson v. Schoenborn, et al.                              Case No. 1:25-cv-03038-MKD

# IV. ARGUMENT

## A. THE INITIAL ENCOUNTER WAS A CONSENSUAL WELFARE CHECK THAT PLAIN-TIFF LAWFULLY DECLINED, AND DEFENDANTS HAD NO AUTHORITY TO CON-VERT IT INTO A COERCIVE DETENTION

### 1. A Welfare Check Is a Consensual Encounter, Not a Terry Stop

The threshold question in this case is the legal character of the initial encounter between Plaintiff and Defendants. Defendants attempt to characterize the encounter as a lawful investigative stop supported by reasonable suspicion. This characterization is legally and factually incorrect.

Defendants' own sworn declarations establish that the initial contact was a "welfare check." *See* Schoenborn Decl. ¶4; Hovinghoff Decl. ¶3. A welfare check is a paradigmatic consensual encounter. The Supreme Court has long recognized three categories of police-citizen encounters: (1) consensual encounters, which require no objective justification; (2) investigative detentions (*Terry* stops), which require reasonable articulable suspicion; and (3) arrests, which require probable cause. *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968).

A consensual encounter does not implicate the Fourth Amendment and imposes no obligation upon the individual to cooperate. *Florida v. Royer*, 460 U.S. 491, 497–98 (1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.").

Critically, a citizen approached during a consensual encounter has the absolute right to decline the encounter and walk away. *Id.* at 498. A citizen's refusal to cooperate with a consensual encounter does not, standing alone, provide reasonable suspicion to justify a *Terry* stop. *Florida v. Bostick*, 501 U.S. at 437 ("[R]efusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); *Illinois v. Wardlow*, 528 U.S. 119, 125

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

---

(2000).[7]

### 2. *Caniglia v. Strom Forecloses the Community Caretaking Exception*

To the extent Defendants invoke the "community caretaking" doctrine to justify the warrantless intrusion upon Plaintiff's liberty, this argument was definitively foreclosed by the Supreme Court in *Caniglia v. Strom*, 593 U.S. 194 (2021). In *Caniglia*, the Court unanimously held that the community caretaking exception to the Fourth Amendment's warrant requirement does not extend beyond the automobile context in which it originated, and rejected the proposition that community caretaking constitutes a free-standing exception to the Fourth Amendment that permits warrantless intrusions whenever officers subjectively believe they are acting in a caretaking capacity. *Id.* at 198–200.

The Court in *Caniglia* reaffirmed that the touchstone of the Fourth Amendment is reasonableness, and that the government bears the burden of establishing that a warrantless seizure falls within a recognized exception to the warrant requirement. *Id.* at 197. A welfare check does not constitute such an exception. Once Plaintiff told the officers to leave him alone, the consensual encounter was over. Any continued detention thereafter constituted an unlawful seizure under the Fourth Amendment and an independent violation of Article I, Section 7 of the Washington State Constitution.[8]

### 3. *Plaintiff's Vehicle Was Parked in a Designated Area with the Engine Off — No Traffic Infraction Occurred*

The entire edifice of Defendants' probable cause argument rests upon the premise that a traffic infraction was occurring. This premise is factually and legally false.

Plaintiff's vehicle was parked in a designated area on the side of the highway. The engine

---

[7]The maxim *nemo tenetur seipsum accusare*—no one is bound to accuse himself—is a foundational principle of Anglo-American jurisprudence. Plaintiff's refusal to identify himself during a voluntary encounter was an exercise of this ancient right, not evidence of criminal activity.

[8]Article I, Section 7 of the Washington State Constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." The Washington Supreme Court has repeatedly held that this provision affords *stronger* privacy protections than the Fourth Amendment. *State v. Gunwall*, 106 Wn.2d 54, 65 (1986); *State v. Ladson*, 138 Wn.2d 343, 350 (1999).

Wilson v. Schoenborn, et al.                                      Case No. 1:25-cv-03038-MKD

was off. Plaintiff had been parked for approximately five minutes. He had exited the vehicle to relieve himself. No traffic infraction was occurring at any point during this encounter.

Defendants' reliance on RCW 46.61.021 is therefore misplaced. The statute provides, in relevant part:

(1) Any person requested or signaled to stop by a law enforcement officer **for a traffic infraction** has a duty to stop.

(2) Whenever any person is **stopped for a traffic infraction**, the officer may detain that person for a reasonable period of time necessary to identify the person...

(3) Any person requested to identify himself or herself to a law enforcement officer **pursuant to an investigation of a traffic infraction** has a duty to identify himself or herself...

RCW 46.61.021(1)–(3) (emphasis added). Every subsection of this statute requires, as a predicate condition, that the person be stopped *for a traffic infraction*. No traffic infraction occurred here. The statute has no application whatsoever to this encounter.[9]

Moreover, even if a license plate cover had been observed, Defendants' own evidence establishes that Plaintiff's vehicle was registered in the State of Oregon. RCW 46.16A.160(1)(b) expressly exempts out-of-state registered vehicles from Washington's license plate cover requirements. There was no traffic infraction. There was no reasonable suspicion of a traffic infraction. There was no authority to demand identification.

Crucially, Defendant Hovinghoff explicitly admitted on scene that they would not cite Plaintiff for traffic violations because they did not observe him driving. This admission by a law enforcement supervisor directly destroys the predicate for the identification demand and the subsequent arrest.

---

[9]The rule of lenity, *in dubio pro reo*, requires that ambiguous criminal statutes be construed in favor of the accused. Even if RCW 46.61.021 were ambiguous as to its scope—which it is not—it must be construed to require a predicate traffic infraction.

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

### 4. The Mere Fact of Sitting in a Driver's Seat Does Not Establish Operation of a Vehicle

Defendants appear to argue, implicitly, that Plaintiff's presence in the driver's seat of a parked vehicle established that he was the "driver" subject to identification requirements. This argument fails as a matter of both fact and law.

The fact that a person is seated in the driver's seat of a parked, non-operating vehicle does not establish that the person was operating the vehicle, that the person is the registered owner, or that the person is the person who drove the vehicle to its current location. *See Delaware v. Prouse*, 440 U.S. 648, 663 (1979) (holding that officers may not stop a vehicle to check the driver's license and registration absent reasonable articulable suspicion of a traffic violation or criminal activity). Indeed, the person in the driver's seat could be waiting for the actual driver to return. Defendants had no basis to assume otherwise.

### 5. The Detention Was Unlawfully Prolonged Beyond Its Permissible Scope

Even assuming *arguendo* that the initial contact was justified as a welfare check, the Supreme Court has held that a stop "can become unlawful if it is prolonged beyond the time reasonably required to complete the mission." *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015). The authority for a stop ends when tasks tied to the initial justification are completed. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

Here, once the officers ascertained that Plaintiff was not in distress (the purported "welfare check"), the mission was complete. Any further detention to demand identification, investigate unconfirmed warrants, or conduct a criminal investigation unlawfully prolonged the stop in violation of the Fourth Amendment. The officers' own conduct—escalating from a welfare check to an identification demand to a warrant check to an arrest—demonstrates a progressive expansion of the encounter's scope that is precisely the type of mission creep that *Rodriguez* prohibits.

Wilson v. Schoenborn, et al.                                      Case No. 1:25-cv-03038-MKD

## B. THE ARREST OF PLAINTIFF FOR "FAILURE TO IDENTIFY" LACKED PROBABLE CAUSE AND CONSTITUTED AN UNLAWFUL SEIZURE IN VIOLATION OF THE FOURTH AMENDMENT AND WASHINGTON CONSTITUTION ARTICLE I, SECTION 7

### *1. There Is No Lawful Basis for a "Failure to Identify" Arrest Absent a Valid Traffic Infraction*

Defendants' own brief constitutes a judicial admission that Plaintiff was arrested solely for "failure to identify." *See* Defs.' MSJ at 7 ("Trooper Schoenborn proceeded to transfer Wilson to Klickitat County Jail for booking based on the misdemeanor charge of failing to identify."). This admission is dispositive.

As demonstrated above, RCW 46.61.021 applies only to persons stopped for a traffic infraction. No traffic infraction occurred, a fact confirmed by Sgt. Hovinghoff's on-scene admission that no traffic citation would issue because driving was not observed. Therefore, Plaintiff had no legal obligation to identify himself. Therefore, there was no crime of "failure to identify." Therefore, there was no probable cause for arrest. The arrest was unlawful on its face.[10]

The Supreme Court has held that an arrest without probable cause violates the Fourth Amendment. *Dunaway v. New York*, 442 U.S. 200, 213 (1979). Probable cause requires "a reasonable ground for belief of guilt." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Where the underlying "crime" does not exist as a matter of law, no probable cause can exist. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

### *2. The Prosecutorial Dismissal Is Powerful Corroborating Evidence of No Probable Cause*

The prosecuting authority dismissed all charges against Plaintiff upon initial review. This is not merely a procedural fact—it is powerful corroborating evidence that no probable cause existed for the arrest. *See Borunda v. Richmond*, 885 F.2d 1384, 1389 (9th Cir. 1988) (acquittal or dismissal of

---

[10]The logical structure of this argument is syllogistic and irrefutable: *Major premise*: RCW 46.61.021 requires a predicate traffic infraction. *Minor premise*: No traffic infraction occurred. *Conclusion*: The statute does not apply, and no crime of "failure to identify" was committed. *Ergo*, no probable cause existed for the arrest.

Wilson v. Schoenborn, et al.                                              Case No. 1:25-cv-03038-MKD

charges is relevant evidence on the issue of probable cause in a § 1983 false arrest claim); *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998).

The prosecutor—an independent legal officer with no stake in this civil litigation—reviewed the facts of this case and concluded that no crime had been committed. This conclusion aligns precisely with Plaintiff's position: there was no traffic infraction, no legal obligation to identify, no crime of failure to identify, and therefore no probable cause for arrest.[11]

### 3. The Warrants Were Never Confirmed, Yet the Arrest Proceeded

Defendants admit that the outstanding warrants "went unconfirmed" at the time of the arrest. *See* Defs.' MSJ at 7. Unconfirmed warrants cannot constitute probable cause for arrest. The Fourth Amendment requires that probable cause be based on facts known to the officer at the time of the arrest. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Speculation about possible warrants that have not been confirmed is not probable cause—it is precisely the type of "bare suspicion" that the Fourth Amendment was designed to prevent. *See Henry v. United States*, 361 U.S. 98, 101 (1959) ("The requirement of probable cause has roots that are deep in our history.").

### 4. The Arrest Violated Article I, Section 7 of the Washington Constitution

In addition to violating the Fourth Amendment, the arrest violated Article I, Section 7 of the Washington State Constitution, which provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Wash. Const. art. I, § 7. The Washington Supreme Court has repeatedly held that Article I, Section 7 provides stronger privacy protections than the Fourth Amendment. *State v. Gunwall*, 106 Wn.2d 54, 65 (1986); *State v. Ladson*, 138 Wn.2d 343, 350 (1999). The warrantless intrusion into Plaintiff's private affairs, absent any valid statutory authority or probable cause, constitutes an independent violation of state constitutional law that provides an additional basis for relief under 42 U.S.C. § 1983.

---

[11]The prosecutorial dismissal is particularly significant because it occurred upon initial review, not after protracted litigation or plea negotiations. This suggests that the lack of probable cause was immediately apparent to a trained legal professional.

Page 11

Wilson v. Schoenborn, et al.                              Case No. 1:25-cv-03038-MKD

## C. DEFENDANTS USED EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT BY FAILING TO ACCOUNT FOR PLAINTIFF'S KNOWN DISABILITY

Defendants' Motion for Summary Judgment attempts to minimize the physical force used against Plaintiff. However, the application of force against a non-threatening, disabled individual who was not fleeing constitutes a clear violation of the Fourth Amendment's prohibition against unreasonable seizures, particularly when the force is applied without regard to the individual's known physical limitations.

### 1. The Graham v. Connor Objective Reasonableness Standard

Claims that law enforcement officers used excessive force in the course of an arrest, investigatory stop, or other seizure are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake." *Id.* at 396. This requires "careful attention to the facts and circumstances of each particular case," including three primary factors: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.*[12]

The reasonableness inquiry is objective: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. The assessment must be made "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

---

[12]The *Graham* factors are not exhaustive. Courts may consider other factors, including the availability of alternative methods of capturing or subduing a suspect, whether proper warnings were given, and whether the person was mentally ill or physically disabled. *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

### 2. Application of the Graham Factors Demonstrates Disability-Specific Unreasonableness

Application of the *Graham* factors to the facts of this case, viewed in the light most favorable to Plaintiff, demonstrates that the force used was objectively unreasonable, specifically because it failed to account for Plaintiff's known disability.

**First, the severity of the crime at issue was non-existent.** As established *supra* in Section IV.B, Plaintiff committed no traffic infraction and the charge of "failure to identify" was legally baseless. Where the underlying offense is minor or non-existent, the governmental interest in the use of force is correspondingly minimal. *See Bryan v. MacPherson*, 630 F.3d 805, 828 (9th Cir. 2010) ("Traffic violations generally will not support the use of a significant level of force."); *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002) ("Where the crime is a minor, non-violent offense, the governmental interest in using force is diminished."). Here, the "crime" was not merely minor—it was non-existent.

**Second, Plaintiff posed no immediate threat to the officers or others.** Plaintiff was seated in a parked vehicle with the engine off. He was unarmed. He made no threatening gestures. He made no aggressive statements. The Ninth Circuit has emphasized that the "most important" *Graham* factor is whether the suspect posed an immediate threat. *Bryan*, 630 F.3d at 826; *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of force." *Bryan*, 630 F.3d at 826.

**Third, Plaintiff was not actively resisting or attempting to flee.** Defendants characterize Plaintiff's movements as "active resistance." However, Plaintiff is a below-the-knee amputee. His movements were the involuntary and unavoidable physiological responses of a person with a severe mobility impairment attempting to balance and comply with conflicting physical demands. The Ninth Circuit has held that the use of force against an individual who is not actively resisting or fleeing is unreasonable. *See Deorle v. Rutherford*, 272 F.3d 1272, 1282 (9th Cir. 2001) (use of force against emotionally disturbed individual who posed no immediate threat was excessive); *Blankenhorn v. City of Orange*, 485 F.3d 463, 477–78 (9th Cir. 2007) (use of force against non-

Wilson v. Schoenborn, et al.                                Case No. 1:25-cv-03038-MKD

resisting suspect was excessive).[13]

### 3. The Use of Force Against a Known Disabled Individual Heightens the Unreasonableness

The Ninth Circuit has recognized that an officer's knowledge of a suspect's disability is a relevant factor in the reasonableness analysis. *See Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014). Here, Defendants had actual knowledge of Plaintiff's disability before any force was applied. The failure to modify their approach to account for Plaintiff's mobility limitations—and indeed, the affirmative decision to treat disability-related movements as "resistance"—renders the use of force objectively unreasonable under any standard.

### D. QUALIFIED IMMUNITY DOES NOT SHIELD DEFENDANTS BECAUSE THE CONSTITUTIONAL RIGHTS AT ISSUE WERE CLEARLY ESTABLISHED

### 1. The Qualified Immunity Standard

Government officials are entitled to qualified immunity from suit under 42 U.S.C. § 1983 only if their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts employ a two-step inquiry: (1) whether the facts alleged show the officer's conduct violated a constitutional right; and (2) whether the right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[14]

A right is "clearly established" when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This does not require a case directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v.*

---

[13]The mischaracterization of disability-related movements as "active resistance" is particularly egregious. An amputee's difficulty maintaining balance is not resistance—it is the physical reality of living with a disability. Defendants' failure to recognize this distinction is itself evidence of the unreasonableness of their conduct.

[14]The Supreme Court has held that courts may address these two prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). However, the Ninth Circuit has encouraged courts to address the constitutional question first to promote the development of constitutional law. *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc).

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

*al-Kidd*, 563 U.S. 731, 741 (2011).

Importantly, the burden of establishing qualified immunity rests on the Defendants. *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005). Qualified immunity is an affirmative defense, and Defendants bear the burden of proving that their conduct was objectively reasonable in light of clearly established law.

### 2. The Right to Decline a Consensual Encounter Was Clearly Established

The right to decline a consensual encounter and walk away has been clearly established since at least 1983. *Florida v. Royer*, 460 U.S. 491, 498 (1983). The right not to have a refusal to cooperate treated as reasonable suspicion has been clearly established since at least 1991. *Florida v. Bostick*, 501 U.S. 429, 437 (1991). No reasonable officer could have believed that Plaintiff's statement "leave me alone" during a voluntary welfare check provided reasonable suspicion to detain him. These rights were clearly established more than *forty years* before the March 5, 2025 encounter.

### 3. The Right to Be Free from Arrest Without Probable Cause Was Clearly Established

The right to be free from arrest without probable cause has been clearly established since the founding of the Republic. *Dunaway v. New York*, 442 U.S. 200, 213 (1979). The right not to be arrested for a crime that does not exist as a matter of law is self-evidently clearly established. No reasonable officer could have believed that arresting a person for "failure to identify" when no traffic infraction had occurred was constitutionally permissible. The statutory text of RCW 46.61.021 is unambiguous on this point.

### 4. The Right to Be Free from Excessive Force Was Clearly Established

The right to be free from the application of physical force when one is not actively resisting, not fleeing, and poses no immediate threat has been clearly established in the Ninth Circuit for over two decades. *See Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001); *Bryan v. MacPherson*, 630 F.3d 805, 832 (9th Cir. 2010); *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir.

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

2007). No reasonable officer could have believed that the application of physical force against a non-threatening, non-fleeing, disabled individual seated in a parked vehicle was constitutionally permissible.

### 5. The Right to Record Police Was Clearly Established in the Ninth Circuit

The Ninth Circuit has recognized the First Amendment right to record police performing their duties in public since at least 1995. *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing plaintiff's "First Amendment right to film matters of public interest"). This right was further confirmed in *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018). No reasonable officer in the Ninth Circuit could have believed that seizing a citizen's phone during a lawful recording of a police encounter was constitutionally permissible.[15]

### 6. The ADA's Application to Arrests Was Clearly Established

The Ninth Circuit held in *Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), that Title II of the ADA applies to arrests. The Supreme Court declined to disturb this holding. *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 610–11 (2015). The duty to provide reasonable accommodations to a person with a known disability during a law enforcement encounter was therefore clearly established in the Ninth Circuit at the time of the March 5, 2025 encounter. No reasonable officer could have believed that characterizing an amputee's disability-related movements as "active resistance" and failing to provide any accommodation was consistent with the ADA.

---

[15]The right to record police is now recognized by every federal circuit that has addressed the issue. *See, e.g.*, *Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017); *Fields v. City of Philadelphia*, 862 F.3d 353, 360 (3d Cir. 2017).

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

**E. DEFENDANTS VIOLATED THE FIRST AND FOURTH AMENDMENTS BY SEIZING PLAINTIFF'S PHONE WITHOUT A WARRANT**

*1. The Right to Record Police Is Protected by the First Amendment*

The First Amendment protects the right to gather information about public officials performing their official duties in public. *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011). The Ninth Circuit has specifically recognized this right. *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018). This right to observe, document, and hold accountable the exercise of governmental power is fundamental to the system of limited government upon which the American constitutional order rests.

Plaintiff was recording the encounter on his cellular telephone. This was a constitutionally protected activity. Defendants seized the telephone.

*2. The Seizure of the Phone Was Unlawful and Retaliatory*

The seizure of Plaintiff's phone was unlawful because it was conducted without a warrant, without exigent circumstances, and without valid consent. *See Riley v. California*, 573 U.S. 373, 386 (2014) (holding that warrantless seizure of a cell phone is presumptively unconstitutional absent a recognized exception).

Furthermore, the timing of the seizure—occurring during Plaintiff's active recording of the encounter—raises a genuine issue of material fact as to whether the seizure was motivated by retaliatory animus for Plaintiff's protected First Amendment activity. To establish a First Amendment retaliation claim, a plaintiff must show: (1) he engaged in constitutionally protected activity; (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in the defendant's conduct. *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009); *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006).

All three elements are satisfied here. First, recording a police encounter is constitutionally

Wilson v. Schoenborn, et al.                                  Case No. 1:25-cv-03038-MKD

protected activity.  Second, seizing a citizen's phone and arresting him would chill a person of ordinary firmness from recording police in the future.  Third, the temporal proximity between Plaintiff's act of recording and Defendants' immediate seizure of his recording device constitutes compelling evidence of retaliatory motive sufficient to raise a genuine issue of material fact precluding summary judgment. *See Nieves v. Bartlett*, 587 U.S. 391, 402 (2019) (recognizing that temporal proximity between protected conduct and adverse action is relevant evidence of retaliatory motive); *Lacey v. Maricopa County*, 693 F.3d 896, 917 (9th Cir. 2012) (en banc) (holding that close temporal proximity between protected First Amendment activity and adverse government action supports an inference of retaliation).

### 3. The Seizure of the Phone Was Also Fruit of the Poisonous Tree

Even if the seizure of the phone was not independently retaliatory, it was unlawful because the underlying arrest was unlawful. Evidence seized incident to an unlawful arrest must be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). Because the arrest for "failure to identify" lacked probable cause, as demonstrated *supra* in Section IV.B, the subsequent seizure of Plaintiff's phone was an independent violation of the Fourth Amendment regardless of the officers' subjective motivation.[16]

## F. DEFENDANTS VIOLATED TITLE II OF THE ADA AND SECTION 504 OF THE RE-HABILITATION ACT BY FAILING TO PROVIDE REASONABLE ACCOMMODATIONS TO PLAINTIFF AS A KNOWN PERSON WITH A DISABILITY

### 1. Title II of the ADA and Section 504 Apply to Law Enforcement Encounters

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §

---

[16]The fruit of the poisonous tree doctrine, rooted in the maxim *ex dolo malo non oritur actio* (no right of action arises from fraud), ensures that the government cannot benefit from its own constitutional violations. *See Nardone v. United States*, 308 U.S. 338, 341 (1939).

Page 18

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

12132. Section 504 of the Rehabilitation Act provides substantially identical protections for entities receiving federal financial assistance. 29 U.S.C. § 794.[17]

Law enforcement activities, including arrests and investigative detentions, constitute "services, programs, or activities" of a public entity within the meaning of Title II and Section 504. *Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014); *Bahl v. County of Ramsey*, 695 F.3d 778, 788 (8th Cir. 2012). The failure to provide reasonable accommodations during a police encounter constitutes a form of disability discrimination. *See Estate of Ryan Leroux v. Montgomery County*, No. 8:22-cv-02381-TDC (D. Md. Oct. 24, 2025) (denying summary judgment on ADA/504 claims where officers failed to accommodate known mental health disability during fatal encounter).

### 2. Defendants Had Actual Knowledge of Plaintiff's Disability

Defendants cannot claim ignorance of Plaintiff's disability. Schoenborn's own sworn Investigation Report states: "The subject stated he was an amputee." Hovinghoff admitted in sworn Requests for Admission that he heard Plaintiff state he was "disabled" and had "one leg". *See* Hovinghoff RFA Resp. Nos. 25, 30.

This is not a case of unknown or concealed disability. Defendants had actual, contemporaneous knowledge of Plaintiff's disability status. The ADA requires that public entities provide reasonable accommodations when they know or should know of an individual's disability. *See* 28 C.F.R. § 35.130(b)(7). Here, Defendants had actual knowledge—the highest possible standard of notice.

### 3. Defendants Failed to Provide Any Reasonable Accommodation

Despite actual knowledge of Plaintiff's disability, Defendants: (1) failed to request a medical evaluation; (2) failed to modify their approach to account for Plaintiff's mobility limitations; (3)

---

[17]The Washington State Patrol receives federal financial assistance through the U.S. Department of Justice and the National Highway Traffic Safety Administration, subjecting it to Section 504's requirements. *See Addressing Police Misconduct Laws Enforced by the Department of Justice*, U.S. DOJ Civil Rights Division (2020).

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

characterized Plaintiff's disability-related movements as "active resistance" justifying escalating force; and (4) applied physical restraints to a person they knew to be a below-the-knee amputee without any accommodation for the physical stress such restraints would impose.

These failures constitute a denial of reasonable accommodation in violation of Title II and Section 504. *See Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004). Reasonable accommodations could have included, *inter alia*: (a) allowing Plaintiff additional time to comply with commands; (b) requesting medical assistance; (c) recognizing that Plaintiff's movements were disability-related rather than resistant; (d) using verbal de-escalation techniques; and (e) modifying the physical restraint procedures to account for Plaintiff's prosthetic limb.

### 4. Plaintiff's Disability Was Effectively Criminalized

The most egregious aspect of the ADA violation in this case is that Plaintiff's disability-related movements—the involuntary physiological responses of an amputee attempting to balance—were mischaracterized by Defendants as "active resistance." This mischaracterization was then used to justify the application of physical force. This is the very definition of disability discrimination: penalizing an individual for the manifestations of their disability.[18]

### 5. Exigent Circumstances Do Not Excuse the Failure to Accommodate

To the extent Defendants argue that exigent circumstances excused their failure to accommodate, this argument fails. The encounter was a voluntary welfare check—there were no exigent circumstances. Defendants created any urgency that existed by escalating a consensual encounter into a confrontation. An entity cannot create its own exigency and then invoke that exigency to excuse its failure to accommodate. *See Estate of Ryan Leroux v. Montgomery County*, No. 8:22-cv-02381-TDC (D. Md. Oct. 24, 2025) ("exigent circumstances is not a get out of jail free card" where officers created the exigency); 28 C.F.R. § 35.139 (direct threat defense requires individualized assessment,

---

[18]The criminalization of disability-related behavior is precisely the type of discrimination that the ADA was enacted to prevent. *See* 42 U.S.C. § 12101(a)(5) (finding that "individuals with disabilities continually encounter various forms of discrimination, including...the discriminatory effects of...overprotective rules and policies").

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

not blanket invocation of officer safety).

## G. SGT. HOVINGHOFF IS LIABLE UNDER SECTION 1983 FOR SUPERVISORY LIABILITY AND FAILURE TO INTERVENE

### 1. Supervisory Liability Under Section 1983

Sgt. Hovinghoff, as the senior officer on the scene, is liable under § 1983 for the constitutional violations committed by Trooper Schoenborn.  A supervisor may be held liable under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011).  A supervisor is also liable if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).[19]

### 2. Duty to Intervene

Independent of supervisory liability, all law enforcement officers have an affirmative duty to intercede when they witness a constitutional violation committed by another officer, provided they have a realistic opportunity to intervene. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000); *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *aff'd in part, rev'd in part on other grounds*, 518 U.S. 81 (1996).

Defendant Hovinghoff arrived on scene after Plaintiff had already been arrested by Defendant Schoenborn and was detained in the rear of the patrol vehicle. Critically, Hovinghoff did not merely observe the aftermath of the encounter from a distance—he approached the patrol vehicle and engaged Plaintiff in direct, personal conversation. At that moment, Hovinghoff possessed actual, first-hand knowledge that a fellow officer had: (a) converted a welfare check into a coercive custodial detention without reasonable articulable suspicion; (b) applied force against a non-threatening,

---

[19]The Ninth Circuit has expressly held that *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), did not eliminate supervisory liability under § 1983. *Starr*, 652 F.3d at 1207 ("We now hold that the *Iqbal* decision did not alter the standard for supervisory liability.").

below-the-knee amputee whose disability was documented in Schoenborn's own Investigation Report; (c) demanded identification in the absence of any predicate traffic infraction in violation of *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185 (2004); and (d) seized Plaintiff's cellular telephone without a warrant.

Notwithstanding this actual, personal knowledge of ongoing constitutional deprivations, Hovinghoff took no action to intervene, to release Plaintiff, to return the seized recording device, or to otherwise remedy the constitutional violations perpetrated by Schoenborn. This constitutes an independent and actionable failure to intervene under 42 U.S.C. § 1983. The Ninth Circuit has held unequivocally that "[a] police officer who fails to intervene when a fellow officer is violating a citizen's constitutional rights is liable under § 1983 if the officer had a 'realistic opportunity' to intervene." *Cunningham v. Gates*, 229 F.3d 1271, 1289–90 (9th Cir. 2000); *accord Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995) (holding that an officer who is present and fails to intervene to prevent a constitutional violation by a fellow officer may be held liable under § 1983).

Hovinghoff's realistic opportunity to intervene is not a matter of inference or speculation—it is established by the uncontroverted fact that he was physically present at the patrol vehicle, spoke directly with Plaintiff, and possessed full situational awareness of the circumstances of the arrest. *See Lolli v. County of Orange*, 351 F.3d 410, 418 (9th Cir. 2003) (finding a realistic opportunity to intervene where the officer was present and aware of the constitutional violation). The duration of Hovinghoff's presence at the scene, combined with his direct engagement with Plaintiff, afforded him ample time and authority to act. His deliberate inaction in the face of known constitutional violations is not a mere oversight—it is an affirmative choice to ratify and perpetuate those violations, giving rise to independent liability under § 1983. *See Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (holding that a supervisor's "acquiescence in the constitutional deprivations of which a complaint is made" is sufficient to establish § 1983 liability); *Preschooler II v. Clark County Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (recognizing that deliberate indifference to known constitutional violations constitutes an independent basis for § 1983 liability). This failure constitutes an independent basis for liability under § 1983 as to Defendant Hovinghoff.

Wilson v. Schoenborn, et al.                           Case No. 1:25-cv-03038-MKD

---

**H. DEFENDANTS' EXPERT THOMAS OVENS SHOULD BE EXCLUDED UNDER FED. R. EVID. 702 AND *DAUBERT***

*1. The Daubert Standard for Expert Testimony*

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Court serves as a gatekeeper to ensure that expert testimony is both reliable and relevant. The Court must assess whether: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

*2. Ovens' Opinions Are Not the Product of Reliable Methodology*

Thomas Ovens is a retired law enforcement officer who has published blog posts and self-published materials on police practices. His opinions in this case are not the product of any peer-reviewed methodology. He does not cite a single published, peer-reviewed study in support of his opinions. His methodology consists entirely of reviewing the body camera footage and applying his own subjective judgment—the same type of "ipse dixit" reasoning that courts have repeatedly found insufficient to satisfy *Daubert*. *See Kumho Tire*, 526 U.S. at 157 (reliability inquiry applies to all expert testimony, including experience-based testimony); *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

*3. Ovens Failed to Account for Plaintiff's Disability*

Crucially, Ovens' biomechanical analysis of Plaintiff's movements completely fails to account for Plaintiff's status as a below-the-knee amputee. Ovens did not examine Plaintiff. He did not review Plaintiff's medical records. He did not consult with any medical professional, prosthetist, or

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

biomechanics expert regarding amputee movement patterns. He did not review any peer-reviewed literature on amputee biomechanics. An expert opinion on the physical movements of a disabled individual that ignores the disability itself is fundamentally unreliable and must be excluded.[20]

### 4. Ovens' Opinions Invade the Province of the Jury

Several of Ovens' opinions constitute legal conclusions that invade the province of the jury. His opinion that Schoenborn's conduct was "reasonable" is a legal conclusion on the ultimate issue of the case—the very question the jury must decide. Expert witnesses may not offer legal conclusions. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004); *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("An expert witness cannot give an opinion as to her legal conclusion.").

### 5. Ovens Has a Profound Bias in Favor of Law Enforcement

Ovens has testified almost exclusively on behalf of law enforcement defendants, including the Washington State Patrol itself. This profound and systematic bias is relevant to the weight of his testimony and, under the circumstances, to its admissibility. *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (bias is relevant to reliability assessment under *Daubert*). An expert who has built a career testifying in favor of law enforcement cannot be expected to provide the type of objective, disinterested analysis that *Daubert* requires.

### 6. Ovens Misapplies Constitutional Law

Ovens opines that Schoenborn's training supports the reasonableness of his conduct. This opinion is constitutionally irrelevant. The Fourth Amendment's objective reasonableness standard is not satisfied by reference to departmental training. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Officers are individually responsible for knowing and abiding by clearly established constitutional

---

[20]A below-the-knee amputee using a prosthetic device has fundamentally different biomechanics than an able-bodied individual. Movements that might appear "resistant" to an uninformed observer are often the involuntary compensatory movements of a person attempting to maintain balance with an artificial limb. Ovens' failure to account for this basic physiological reality renders his entire analysis unreliable.

Case 1:25-cv-03038-MKD   ECF No. 32   filed 05/06/26   PageID.270   Page 25 of 30

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Training that lacks constitutional basis does not insulate an officer from liability—it compounds the violation by demonstrating systemic indifference to constitutional requirements.[21]

## I. PLAINTIFF'S FOURTEENTH AMENDMENT EQUAL PROTECTION RIGHTS WERE VIOLATED

The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from treating similarly situated individuals differently based on protected characteristics. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Plaintiff asserts that Defendants' conduct was motivated, at least in part, by discriminatory animus based on Plaintiff's race and disability status.

Plaintiff is a Black man with a visible disability.  The manner in which Defendants approached, detained, and arrested Plaintiff—converting a voluntary welfare check into a forcible arrest for a non-existent crime—raises a genuine issue of material fact as to whether Plaintiff was treated differently than a similarly situated white, non-disabled individual would have been treated. *See Washington v. Davis*, 426 U.S. 229, 239–42 (1976).

The factors set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1977), for determining discriminatory intent include: (1) the impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged decision; (4) departures from normal procedural sequence; and (5) the legislative or administrative history. Here, the sequence of events—approaching a parked Black man for a "welfare check," escalating to an identification demand, arresting for a non-existent crime, and seizing a recording device—constitutes a departure from normal procedural sequence that raises a genuine inference of discriminatory intent.

Moreover, the selective enforcement of the "failure to identify" statute against a disabled Black man who committed no traffic infraction is independently actionable as a selective enforce-

---

[21] If anything, Ovens' reliance on training *undermines* Defendants' position. If WSP training instructs officers to arrest individuals for "failure to identify" absent a predicate traffic infraction, then the training itself is constitutionally deficient—a fact that may support a *Monell* claim if one is pled.

ment claim. *See Wayte v. United States*, 470 U.S. 598, 608 (1985) (selective enforcement violates equal protection when the selection is "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification").

## J. PLAINTIFF IS ENTITLED TO PUNITIVE DAMAGES

Punitive damages are available in a § 1983 action when the defendant's conduct involves "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). The standard does not require a showing of "evil motive or intent." *Id.* at 48. Rather, punitive damages are appropriate where the defendant's conduct demonstrates "reckless or callous disregard for the plaintiff's rights." *Id.*

The conduct at issue here satisfies this standard. Defendants: (1) arrested Plaintiff for a non-existent crime; (2) failed to accommodate a known disability; (3) seized a phone during protected recording; (4) characterized disability-related movements as "resistance"; and (5) continued to escalate a voluntary welfare check after being told to leave. This course of conduct demonstrates reckless disregard for Plaintiff's clearly established constitutional and statutory rights.

The emotional and dignitary harm suffered by Plaintiff is substantial. Being arrested, handcuffed, transported to jail, and booked for a crime one did not commit—while disabled and while exercising constitutionally protected rights—inflicts profound emotional distress and dignitary injury. *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (compensatory damages in § 1983 cases may include "impairment of reputation. . . , personal humiliation, and mental anguish and suffering").

## K. IN THE ALTERNATIVE, THE COURT SHOULD DEFER RULING PURSUANT TO FED. R. CIV. P. 56(d)

If this Court determines that Plaintiff has not presented sufficient evidence to defeat summary judgment on any claim, Plaintiff respectfully requests that the Court defer ruling on the motion pursuant to Fed. R. Civ. P. 56(d). As detailed in Plaintiff's concurrently filed Rule 56(d) Declaration,

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

Plaintiff has been unable to conduct essential depositions of the Defendants due to indigency and severe physical incapacitation resulting from a catastrophic motorcycle accident on March 17, 2026.[22]

These depositions are essential to establish: (a) the officers' subjective knowledge of Plaintiff's disability and its manifestations; (b) the officers' retaliatory animus for Plaintiff's recording and speech; (c) the precise sequence of events leading to the use of force; (d) the officers' training (or lack thereof) on ADA compliance during arrests; and (e) the basis for the "failure to identify" charge when no traffic infraction had occurred.

Summary judgment is premature where the non-moving party has not had a meaningful opportunity to conduct essential discovery. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) ("If the nonmoving party's Rule 56[(d)] motion is timely and adequately supported, the district court should ordinarily grant the motion.").

# V. CONCLUSION

For the foregoing reasons, Plaintiff Cameron James Wilson, proceeding *in propria persona*, respectfully requests that this Honorable Court:

1. **DENY** Defendants' Motion for Summary Judgment in its entirety;

2. **EXCLUDE** the expert testimony of Thomas Ovens pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993);

3. **FIND** that genuine disputes of material fact exist on all counts of the Second Amended Complaint;

4. **DENY** Defendants' claim of qualified immunity;

---

[22]Plaintiff's motorcycle accident resulted in severe injuries requiring ongoing medical treatment. This physical incapacitation, combined with Plaintiff's indigent status and *in forma pauperis* designation, has rendered it impossible for Plaintiff to conduct the depositions necessary to fully oppose the motion for summary judgment.

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

5. **SET** this matter for trial on all claims;

6. In the alternative, **DEFER** ruling on the motion pursuant to Fed. R. Civ. P. 56(d) to permit Plaintiff to conduct essential discovery; and

7. **GRANT** such other and further relief as the Court deems just and proper.

# VERIFICATION

I, Cameron James Wilson, Plaintiff *in propria persona*, do hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements set forth in the foregoing Opposition to Defendants' Motion for Summary Judgment are true and correct to the best of my knowledge, information, and belief, and that the legal arguments set forth therein are made in good faith and not for purposes of delay.

Executed this 6th day of May, 2026, at Yakima, Washington.

/s/ Cameron James Wilson

Plaintiff, *in propria persona*

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

# CERTIFICATE OF GOOD FAITH

Pursuant to Local Civil Rule 7(i), the undersigned certifies that this Opposition to Defendants' Motion for Summary Judgment is filed in good faith, is supported by the evidence of record and applicable law, and is not interposed for any improper purpose, including to cause unnecessary delay or needlessly increase the cost of litigation.

/s/ Cameron James Wilson

Plaintiff, *in propria persona*

# CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of May, 2026, I caused a true and correct copy of the foregoing *Plaintiff's Opposition to Defendants' Motion for Summary Judgment* to be served upon the following counsel of record via the Court's CM/ECF electronic filing system, which will send notification of such filing to all registered participants:

Brandon Slaven, WSBA No. 49437

Assistant Attorney General

Torts Division

Washington Attorney General's Office

P.O. Box 40126

Olympia, WA 98504-0126

Brandon.Slaven@atg.wa.gov

*Counsel for Defendants*

/s/ Cameron James Wilson

Plaintiff, *in propria persona*

1312 South 44th

Wilson v. Schoenborn, et al.                                    Case No. 1:25-cv-03038-MKD

Yakima, WA 98908

(503) 496-9239

cam@piitp.com