UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

AT YAKIMA

CAMERON JAMES WILSON,

    *Plaintiff*,

v.

DAVID SCHOENBORN and

SERGEANT NATE HOVINGHOFF,

    *Defendants.*

Case No. 1:25-cv-03038-MKD

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**

ORAL ARGUMENT REQUESTED

## I. INTRODUCTION

Defendants' Renewed Motion for Summary Judgment (ECF No. 46) is an exercise in evidentiary fiction. It is constructed entirely upon the sanitized, self-serving declarations of Trooper David Schoenborn (ECF No. 25) and Sergeant Nate Hovinghoff (ECF No. 26)—declarations executed months before both Defendants sat for their sworn depositions on June 15 and 16, 2026. In those depositions, conducted under oath and recorded on video, both Defendants made case-dispositive admissions that fatally contradict their prior declarations and obliterate every legal argument advanced in their present motion.

    Defendants' motion conspicuously omits any reference to the deposition record. This omission is not inadvertent—it is a deliberate litigation strategy designed to prevent this Court from

1

WILSON v. SCHOENBORN, ET AL.                                    NO. 1:25-cv-03038-MKD

confronting the sworn testimony that destroys the Defendants' case. Plaintiff now places that testimony squarely before the Court.

Under the summary judgment standard, all facts must be viewed in the light most favorable to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the actual evidentiary record is so viewed, the following undisputed facts emerge directly from the Defendants' own sworn testimony:

1. Trooper Schoenborn admitted the initial contact was a "community caretaking" welfare check—not a traffic investigation. (Schoenborn Depo. 47:24–48:14).

2. When asked what crime he suspected Plaintiff of committing, Trooper Schoenborn replied: "**Nothing**." (Schoenborn Depo. 48:18–25).

3. Both Defendants admitted they *never observed Plaintiff driving* the vehicle. (Schoenborn Depo. 47:5–8; Hovinghoff Depo. 93:25–94:1).

4. Trooper Schoenborn admitted he *knew* he lacked the legal authority to issue a citation under RCW 10.31.100 because he did not observe Plaintiff driving. (Schoenborn Depo. 102:6–8).

5. Trooper Schoenborn admitted he utilized "Google AI" *after* the arrest to search for a statutory justification. (Schoenborn Depo. 103:10–17).

6. Trooper Schoenborn admitted, step by step, that if Plaintiff had no legal duty to identify, then his refusal to identify was not a crime. (Schoenborn Depo. 53:15–21).

These admissions do not merely defeat Defendants' motion—they compel judgment as a matter of law in Plaintiff's favor. Accordingly, Plaintiff respectfully submits this combined Opposition and Cross-Motion for Partial Summary Judgment on the issue of liability, reserving the quantum of damages for trial.

## II. LEGAL STANDARD

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view all facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The Supreme Court has emphasized that courts must exercise particular care in applying the summary judgment standard in civil rights cases. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam) (reversing grant of summary judgment where court "failed to adhere to the axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" (internal quotation marks omitted)). Where video evidence exists, the Court views the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007). The body camera footage of this encounter—which Defendants conspicuously fail to address—corroborates Plaintiff's account.

Pro se filings are "liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Haines v. Kerner*, 404 U.S. 519, 520 (1972). This liberal construction extends to the summary judgment stage. *Blaisdell v. Frappiea*, 729 F.3d 1237, 1241 (9th Cir. 2013).

Where cross-motions for summary judgment are filed, the Court evaluates each motion on its own merits. *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013). The filing of cross-motions "does not necessarily mean that there are no disputed issues of material fact and does not necessarily permit the judge to render judgment in favor of one side or the other." *Id.*

Critically, under the "sham affidavit" doctrine, a party cannot create a genuine issue of material fact by relying on an affidavit that contradicts their own prior sworn deposition testimony. *Kennedy*

3

*v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). Where a declaration is "flatly contradicted" by deposition testimony, the deposition controls. *Id.* To the extent Defendants' declarations (ECF Nos. 25, 26) assert facts contradicted by their subsequent deposition testimony, those declarations are entitled to no weight. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009).

## III. FOURTH AMENDMENT: UNLAWFUL SEIZURE AND FALSE AR-REST

### A. The Initial Encounter Was a Welfare Check That Concluded When Plaintiff Declined Assistance

Defendants argue the encounter was a lawful traffic investigation from inception. The sworn testimony contradicts this. Trooper Schoenborn admitted under oath that the initial contact was a "community caretaking" welfare check. (Schoenborn Depo. 47:24–48:14). He testified that he approached a stationary vehicle parked because he was concerned about the welfare of the occupant.

The community caretaking exception is narrowly construed and terminates when the citizen communicates that assistance is not needed. *Caniglia v. Strom*, 593 U.S. 194 (2021) (unanimously holding that the community caretaking exception does not extend beyond the automobile context and is not a "freestanding" warrant exception). Plaintiff stated "I'm okay, I don't need your service" and declined assistance. (Schoenborn Depo. 48:8–14). At that moment, the consensual encounter concluded as a matter of law. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual."); *Florida v. Royer*, 460 U.S. 491, 497–98 (1983) (citizen may decline consensual encounter and walk away without consequence).

Any further detention required reasonable, articulable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). A citizen's refusal to cooperate with police, without more, does

WILSON v. SCHOENBORN, ET AL.                                NO. 1:25-cv-03038-MKD

not furnish reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("[R]efusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.").

## B. The Detention Exceeded Its Permissible Scope

Even if the initial welfare check were deemed a lawful investigative stop, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015); *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission.' ").

The "mission" of a welfare check is to ascertain whether a citizen requires assistance. Plaintiff communicated that he did not. The mission was complete. Every second of detention thereafter was constitutionally unauthorized. Schoenborn's subsequent demand for identification, escalation to arrest, and deployment of physical force all occurred *after* the lawful basis for the encounter had terminated.

## C. Schoenborn Suspected "Nothing"—No Reasonable Suspicion Existed

When asked under oath what crime he suspected Plaintiff of committing at the time he escalated the encounter, Trooper Schoenborn replied: "**Nothing**." (Schoenborn Depo. 48:18–25). This single admission is dispositive. A seizure based on "nothing" is the quintessential Fourth Amendment violation. *Brown v. Texas*, 443 U.S. 47, 52 (1979) ("In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference.").

Defendants cannot now argue—through their motion—that probable cause or reasonable suspicion existed when their own client admitted under oath that he suspected nothing. The Court must accept the non-moving party's version of the facts, and here, the non-moving party's version is corroborated by the *moving party's own sworn testimony. Tolan*, 572 U.S. at 657 ("[C]ourts may

5

WILSON v. SCHOENBORN, ET AL.                                      NO. 1:25-cv-03038-MKD

not resolve genuine disputes of fact in favor of the party seeking summary judgment.").

### D. No Driving Was Observed—RCW 10.31.100 Authority Destroyed

Defendants' entire probable cause theory rests on the assertion that Schoenborn was investigating a license plate cover infraction under RCW 46.16A.200(7)(c). This theory requires that Plaintiff was "operating or in charge of" the vehicle and that the infraction was committed "in the officer's presence" per RCW 10.31.100.

Both Defendants admitted they never observed Plaintiff driving. (Schoenborn Depo. 47:5–8; Hovinghoff Depo. 93:25–94:1). Sergeant Hovinghoff admitted he told Schoenborn: "Ideally there's no citing him for any traffic infractions" and "we won't cite for any violations 'cause under 10.31.100, we didn't see him drive the car." (Schoenborn Depo. 102:6–8). Schoenborn agreed with this assessment. He *knew*, at the time of the arrest, that he lacked statutory authority.

An officer who admits he knew he lacked statutory authority to act, yet proceeds to arrest a citizen anyway, has committed a seizure that is unreasonable *per se*. *Groh v. Ramirez*, 540 U.S. 551, 563–64 (2004) (where the officer knew or should have known the legal authority was deficient, the seizure is *per se* unreasonable and qualified immunity is unavailable); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity does not protect officers who "knowingly violate the law"). The arrest was not merely "mistaken"—it was a knowing violation of established law.

### E. The Complete Syllogism: Schoenborn Admitted the Arrest Was Unlawful

During his deposition, Trooper Schoenborn was walked through a logical syllogism and agreed with each step:

1. "You never observed me driving the car, correct?" — "*Correct*." (Schoenborn Depo. 47:5–8).

2. "A person standing outside a parked vehicle with the engine off is not operating that vehicle, correct?" — "*Yes*." (Schoenborn Depo. 29:20–26).

6

WILSON v. SCHOENBORN, ET AL.                                    NO. 1:25-cv-03038-MKD

3. "If the statute did not apply to me, I had no legal duty to provide you with identification, correct?" — "*Then yes, you would not have to.*" (Schoenborn Depo. 53:15–21).

4. "If I had no legal duty to identify, my refusal to identify was not a crime, correct?" — "*Correct.*" (Schoenborn Depo. 53:18–21).

5. "If a trooper arrests someone for a crime that does not exist, is that a lawful arrest?" — "*If it doesn't exist and they arrested him, no.*" (Schoenborn Depo. 102:15–19).

This is not Plaintiff's characterization of the facts. This is the Defendant's own sworn, step-by-step admission that the arrest was unlawful. No reasonable juror could find otherwise. The syllogism is irrefutable because it is constructed entirely from the Defendant's own concessions.

**F. The "Google AI" Admission Defeats *Devenpeck***

Defendants rely on *Devenpeck v. Alford*, 543 U.S. 146 (2004), arguing that even if the stated reason for arrest was invalid, alternative probable cause existed under RCW 46.61.020 because Plaintiff was "in charge of a vehicle" and refused to identify.

*Devenpeck* requires that the objective facts establishing probable cause be "known to the arresting officer at the time of the arrest." *Id.* at 152. Schoenborn admitted he utilized "Google AI" *after* the arrest to search for a statutory justification:

"So I looked at the RCW and then Googled it as well, and then Google AI gave me that one." (Schoenborn Depo. 103:10–17).

An officer cannot arrest a citizen based on "nothing," consult an artificial intelligence chatbot post-seizure to reverse-engineer probable cause, and then invoke *Devenpeck* to validate the arrest retroactively. This is the precise post-hoc rationalization the Fourth Amendment prohibits. *Devenpeck*, 543 U.S. at 153 ("[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."). The "facts known" to Schoenborn at the time

7

of arrest were, by his own admission, "nothing." No amount of post-arrest Googling can cure that constitutional deficiency.

Furthermore, the admission that an officer relied on an AI chatbot to construct a legal justification *after* depriving a citizen of liberty is itself evidence of the absence of probable cause at the time of arrest. An officer who possesses probable cause does not need to consult Google AI to find it.

### G. The "In Charge Of" Theory Fails on the Undisputed Facts

Defendants argue that even without observed driving, Plaintiff was "in charge of" the vehicle under RCW 46.61.020. This theory fails for four independent reasons:

*First*, Sergeant Hovinghoff admitted he could not define what constitutes being "in charge of" a vehicle. (Hovinghoff Depo. 94:3–5). When pressed, he offered to consult "Webster's dictionary." An officer who cannot define the elements of the offense he is enforcing cannot possess probable cause to arrest for that offense. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (probable cause requires "reasonable ground for belief of guilt").

*Second*, Schoenborn admitted that Plaintiff was standing outside the vehicle at first contact. (Schoenborn Depo. 29:10–19). He further admitted that "a person standing outside a parked vehicle with the engine off is not operating that vehicle." (Schoenborn Depo. 29:20–26). A person standing outside a stationary vehicle is not "in charge of" it for purposes of the traffic code.

*Third*, even if Plaintiff were "in charge of" the vehicle, RCW 46.61.020 requires that the person be "requested by a police officer to give his or her name and address" during a lawful stop. Because no lawful stop existed—as Schoenborn admitted he suspected "nothing"—the statutory predicate for RCW 46.61.020 was never triggered. The statute does not authorize random identification demands untethered to any lawful basis. *Brown v. Texas*, 443 U.S. at 52.

*Fourth*, Schoenborn admitted he invoked *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), to justify ordering Plaintiff back to his vehicle. (Schoenborn Depo. 44:19–22). He then admitted that *Mimms* applies to traffic stops (Schoenborn Depo. 44:21–22), and that this encounter was *not* a

traffic stop—it was a welfare check. (Schoenborn Depo. 47:24–48:5). This misapplication of case law further demonstrates the absence of any lawful basis for the detention.

### H. The Oregon Plates Were Lawful—No Infraction Existed

Defendants assert that a license plate cover violation provided the initial basis for investigation. However, the vehicle bore Oregon plates. Under RCW 46.16A.160, vehicles registered in other states are exempt from Washington registration and display requirements while temporarily in Washington. Schoenborn admitted he was aware the plates were from Oregon. (Schoenborn Depo. 55:7–12). An officer cannot manufacture probable cause from a "violation" that does not exist as a matter of law. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979) (officers may not stop vehicles to check license absent reasonable suspicion of a traffic violation).

### I. The Phone Seizure Constitutes an Independent Fourth Amendment Violation

During the encounter, Schoenborn seized the cellular phone Plaintiff was using to record the interaction. (Hovinghoff Depo. 87:22–88:6). Hovinghoff admitted: "The phone was taken away from Mr. Wilson at some point in the contact." (Hovinghoff Depo. 88:1–2). A cellular phone is a constitutionally protected "effect" under the Fourth Amendment. *Riley v. California*, 573 U.S. 373, 403 (2014) ("[A] cell phone search would typically expose to the government far more than the most exhaustive search of a house.").

The seizure of the phone was unlawful because it was the direct product of an unlawful arrest. But for the unconstitutional arrest, the phone would never have been seized. The phone seizure therefore constitutes an independent Fourth Amendment violation flowing directly from the initial constitutional wrong.

## IV. EXCESSIVE FORCE UNDER THE FOURTH AMENDMENT

The Fourth Amendment's prohibition against unreasonable seizures encompasses claims of excessive force during an arrest. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The reasonableness

WILSON v. SCHOENBORN, ET AL.                                    NO. 1:25-cv-03038-MKD

of force is evaluated under a three-factor test: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. "The 'most important' factor under *Graham* is whether the suspect posed an 'immediate threat to the safety of the officers or others.'ʼʼ *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).

All three *Graham* factors weigh decisively in Plaintiff's favor:

*First*, the severity of the crime was zero. Schoenborn admitted he suspected "nothing." (Schoenborn Depo. 48:18–25). Where no crime is suspected, the governmental interest in the use of force is at its nadir. *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002) ("Where the crime is minor and/or non-violent, the governmental interest in the use of force is diminished.").

*Second*, Plaintiff posed no immediate threat. Schoenborn admitted that Plaintiff was not "actively fighting" and that "combative" was a "slip of the tongue." (Schoenborn Depo. 46:4–12). Plaintiff is a known amputee. He was standing outside a parked vehicle. He was not armed. He was not aggressive. He was exercising his First Amendment rights. *Bryan v. MacPherson*, 630 F.3d 805, 828 (9th Cir. 2010) ("[T]raffic violations generally will not support the use of a significant level of force."); *Deorle v. Rutherford*, 272 F.3d 1272, 1282 (9th Cir. 2001) (force against non-threatening individual who posed no immediate danger was excessive).

*Third*, Plaintiff was not actively resisting. He was verbally asserting his rights—which is constitutionally protected conduct, not resistance. *Blankenhorn v. City of Orange*, 485 F.3d 463, 477–78 (9th Cir. 2007) (force against non-resisting suspect was excessive). Schoenborn admitted he cannot recall receiving de-escalation training (Schoenborn Depo. 11:20–27) and admitted he approached Plaintiff rather than the reverse (Schoenborn Depo. 45:13–14). The officer escalated; the citizen did not.

The application of physical force—including handcuffing a known amputee, threatening a taser deployment, and physically restraining Plaintiff—was objectively unreasonable under the totality of the circumstances. No reasonable officer would apply force to a non-threatening, non-resisting amputee who was suspected of "nothing."

10

WILSON v. SCHOENBORN, ET AL.                                    NO. 1:25-cv-03038-MKD

## V. QUALIFIED IMMUNITY IS DEFEATED AS A MATTER OF LAW

Defendants assert qualified immunity as their primary defense. (ECF No. 43). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The doctrine involves a two-prong inquiry: (1) whether the facts alleged show the officer's conduct violated a constitutional right; and (2) whether the right was "clearly established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The burden of establishing qualified immunity rests on the Defendants. *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005).

**Prong One** is satisfied. As demonstrated in Section III, the arrest violated the Fourth Amendment. Schoenborn admitted he suspected "nothing," knew he lacked statutory authority, admitted the refusal to identify was not a crime, and used Google AI post-arrest to search for a justification. These admissions establish a constitutional violation beyond any genuine dispute.

**Prong Two** is satisfied. The right to be free from arrest without probable cause has been clearly established since the founding of the Republic. *Brown v. Texas*, 443 U.S. at 52 (1979). The right to refuse identification absent reasonable suspicion has been clearly established since 1979. *Id.* No reasonable officer could believe that arresting a citizen for refusing to identify—when the officer admits he suspected "nothing" and knew he lacked statutory authority—was lawful. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (right is clearly established when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right").

More critically, Schoenborn's admissions place him squarely in the *Malley* category of "those who knowingly violate the law." He admitted he *knew* he could not cite under RCW 10.31.100. He admitted he suspected "nothing." He admitted the refusal to identify was not a crime if no duty existed. An officer who admits all of this and proceeds to arrest anyway is not merely "incompetent"—he is an officer who "knowingly violate[d] the law." *Malley*, 475 U.S. at 341. Qualified immunity does not protect knowing violations. *Id.*

11

WILSON v. SCHOENBORN, ET AL.                                        NO. 1:25-cv-03038-MKD

The Ninth Circuit has held that where an officer's conduct is patently unconstitutional, a plaintiff need not identify a case with identical facts. *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1079 (9th Cir. 2011). Arresting a citizen based on "nothing" and consulting Google AI for a post-hoc justification is patently unconstitutional. No closely analogous precedent is required because "the unlawfulness [is] apparent." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Schoenborn admitted he was unaware of *Brown v. Texas*. (Schoenborn Depo. 25:4–12). He admitted he did not know 42 U.S.C. § 1983. (Schoenborn Depo. 9:15–18). Ignorance of landmark constitutional law does not shield an officer from liability—it confirms incompetence. *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) (qualified immunity turns on "objective legal reasonableness," not the officer's subjective knowledge). An officer's failure to know the law he is sworn to uphold is precisely the "plain incompetence" that *Malley* refuses to protect.

## VI. FIRST AMENDMENT RETALIATION

Defendants argue Plaintiff's First Amendment claim is barred by *Nieves v. Bartlett*, 587 U.S. 391 (2019). *Nieves* holds that the presence of probable cause generally defeats a retaliatory arrest claim. Because Defendants lacked probable cause—as Schoenborn admitted—the *Nieves* bar does not apply.

The First Amendment protects "a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987). The "freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462–63. Plaintiff engaged in protected speech by verbally challenging the lawfulness of the encounter and asserting his constitutional rights. The First Amendment does not permit police to "use force to stifle" such criticism. *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990).

The retaliatory animus is established by the following undisputed facts:

1. Schoenborn admitted to snapping his fingers at Plaintiff—a dehumanizing gesture di-

rected at a citizen exercising his rights. (Schoenborn Depo. 45:15–16).

2. Schoenborn admitted *he* approached Plaintiff, not vice versa: "Video looks like I took steps closer to Wilson." (Schoenborn Depo. 45:13–14). This is escalation, not de-escalation.

3. Schoenborn broadcasted over the radio that Plaintiff was "combative"—then admitted under oath that no fighting occurred and the label was a "slip of the tongue." (Schoenborn Depo. 46:4–12). The fabrication of a false "combative" narrative is direct evidence of retaliatory animus.

4. Schoenborn labeled Plaintiff a "sovereign citizen" to his supervisor. (Schoenborn Depo. 76:8–15). Hovinghoff admitted that the "sovereign citizen" label affected his assessment of the situation. (Hovinghoff Depo. 24:8–25). This label was applied because Plaintiff asserted his rights—a quintessentially protected activity.

5. Schoenborn seized the phone Plaintiff was using to record the encounter. (Hovinghoff Depo. 87:22–88:6). The right to record police performing their duties in public is protected by the First Amendment. *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011); *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018).

The temporal proximity between Plaintiff's exercise of First Amendment rights and the escalation to arrest, combined with the false "combative" narrative and the seizure of the recording device, establishes retaliatory animus as a matter of law. *Nieves*, 587 U.S. at 402 (temporal proximity is relevant evidence of retaliatory motive).

## VII. FOURTEENTH AMENDMENT: SUBSTANTIVE DUE PROCESS

Defendants argue that the Fourth Amendment, not the Fourteenth, governs the seizure. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994). While the false arrest claim is properly analyzed under

the Fourth Amendment, the Fourteenth Amendment's substantive due process protections are independently implicated where government conduct "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

The conduct here shocks the conscience: an officer who admits he suspected "nothing," who admits he knew he lacked statutory authority, who arrested a known amputee for exercising his constitutional rights, who fabricated a "combative" narrative, who snapped his fingers at the citizen, and who then consulted an AI chatbot to reverse-engineer a justification—this is conduct that "shocks the conscience" and offends "the community's sense of fair play and decency." *Lewis*, 523 U.S. at 847 (quoting *Rochin v. California*, 342 U.S. 165, 173 (1952)).

Furthermore, Hovinghoff's admission that he believes "state statutes can override the Constitution" (Hovinghoff Depo. 46:3–7) reflects a fundamental repudiation of the Supremacy Clause and the foundational principles of due process. A supervisor who holds this belief and ratifies an arrest based upon it has acted with deliberate indifference to constitutional rights.

## VIII. AMERICANS WITH DISABILITIES ACT—TITLE II

The Ninth Circuit has explicitly held that Title II of the ADA applies to police arrests. *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd in part on other grounds*, 575 U.S. 600 (2015); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). Officers must provide reasonable accommodations to individuals with known disabilities during an arrest. *Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004) (Title II validly abrogates state sovereign immunity for fundamental rights).

Schoenborn admitted he knew Plaintiff was an amputee *before* applying physical restraints. (Schoenborn Depo. 65:7–8; RFA No. 12). Hovinghoff admitted he knew Plaintiff had a disability. (Hovinghoff Depo. 94:13–14). Despite this actual knowledge:

1. No medical personnel were summoned to evaluate Plaintiff. (Hovinghoff Depo. 87:2–8; Hovinghoff RFA No. 30).

14

2. No reasonable accommodation was provided during the arrest, handcuffing, or transport of a known amputee.

3. Schoenborn admitted he received no ADA training, no training on accommodating individuals with physical disabilities, and no training on interacting with amputees. (Schoenborn Depo. 11:20–27).

4. Hovinghoff's interrogatory response stated "None" when asked when he became aware of Plaintiff's disability—contradicting his on-camera statement "I understand you have an amputated leg." (Hovinghoff Depo. 56:21–26).

This constitutes deliberate indifference to a known disability in violation of Title II. *Duvall*, 260 F.3d at 1139 ("Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood."). The complete absence of ADA training is evidence of a systemic failure that proximately caused the violation.

## IX. SUPERVISORY LIABILITY OF SERGEANT HOVINGHOFF

Sergeant Hovinghoff was the on-scene supervisor. He arrived, assessed the situation, and ratified the arrest. A supervisor is liable under § 1983 if he "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). Officers have a "duty to intercede when they witness a fellow officer violating the constitutional rights of a citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000); *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994).

Hovinghoff's liability is established by the following admissions:

1. He admitted he told Schoenborn they could not cite under RCW 10.31.100—yet did not direct Plaintiff's release. (Hovinghoff Depo. 93:25–94:1; Schoenborn Depo. 102:6–8; Hovinghoff RFA No. 26).

15

2. He admitted he conflated probable cause and reasonable suspicion—the two foundational standards of Fourth Amendment law—in his sworn interrogatory responses. (Hovinghoff Depo. 92:17–24).

3. He admitted he could not define what constitutes a "crime" and offered to consult Webster's dictionary. (Hovinghoff Depo. 94:3–5).

4. He admitted the "sovereign citizen" label affected his assessment of the situation. (Hovinghoff Depo. 24:8–25).

5. He admitted the prosecutor refused to file charges—yet he did not direct Plaintiff's immediate release. (Hovinghoff Depo. 96:9).

6. He told Plaintiff's wife the charge was "failure to identify" *after* Plaintiff had already identified himself verbally. (Hovinghoff Depo. 56:21–26).

7. He admitted he was "trying to reason through" whether the failure-to-identify charge was valid—an admission that he was unsure of the legal basis for the arrest at the time he ratified it. (Hovinghoff Depo. 91:13–14).

A supervisor who knows the arrest lacks legal authority, yet ratifies it and fails to intervene, is liable under § 1983. *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). Hovinghoff had multiple realistic opportunities to intervene and chose not to. His liability is established as a matter of law.

## X. CONCLUSION

Defendants' Renewed Motion for Summary Judgment relies on a fictionalized narrative that their own clients have repudiated under oath. The sworn deposition testimony of Trooper Schoenborn and Sergeant Hovinghoff establishes, beyond any genuine dispute of material fact, that Plaintiff was seized without reasonable suspicion, arrested without probable cause, retaliated against for exercising his First Amendment rights, subjected to conscience-shocking conduct in violation of

WILSON v. SCHOENBORN, ET AL.                                                    NO. 1:25-cv-03038-MKD

the Fourteenth Amendment, and denied reasonable accommodation for his known disability in violation of the ADA.

The evidentiary record is extraordinary in its clarity. An officer who admits he suspected "nothing," who admits he knew he lacked statutory authority, who admits the refusal to identify was not a crime, who admits he snapped his fingers at the citizen, who admits he fabricated a "combative" label, and who admits he consulted Google AI *after* the arrest to find a justification—such an officer is not entitled to qualified immunity. He is entitled to judgment against him.

The damages flowing from this conduct are substantial. Plaintiff—an amputee—was subjected to an unlawful arrest, physical restraint without accommodation, seizure of his recording device, fabrication of a false "combative" narrative, and the indignity of being booked and fingerprinted for a "crime" that both Defendants now admit was not a crime. The charges were dismissed. *See Borunda v. Richmond*, 885 F.2d 1384, 1389 (9th Cir. 1988) (dismissal of charges is relevant evidence on probable cause). The compensatory damages include physical injury, emotional distress, humiliation, loss of liberty, and reputational harm. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986). Punitive damages are warranted where, as here, the officer acted with "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). An officer who admits he *knew* the arrest was unlawful and proceeded anyway has acted with precisely such indifference.

*Nemo est supra leges*—no one is above the law. For the foregoing reasons, Plaintiff respectfully requests that this Court:

1. **DENY** Defendants' Renewed Motion for Summary Judgment (ECF No. 46) in its entirety;

2. **GRANT** Plaintiff's Cross-Motion for Partial Summary Judgment on the issue of liability;

3. **STRIKE** Defendants' affirmative defense of qualified immunity; and

4. **SET** this matter for trial solely on the quantum of damages.

WILSON v. SCHOENBORN, ET AL. NO. 1:25-cv-03038-MKD

DATED this 31 day of July, 2026.

/s/CAMERON JAMES WILSON

*Plaintiff, Pro Se—In Propria Persona*

1312 South 44th Street

Yakima, Washington 98908

(503) 496-9239 — cam@piitp.com

WILSON v. SCHOENBORN, ET AL.                                   NO. 1:25-cv-03038-MKD

## CERTIFICATE OF SERVICE

I hereby certify that on the date indicated below, I caused a true and correct copy of the forego-ing **PLAINTIFF'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUM-MARY JUDGMENT AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**, together with all supporting documents, to be served upon all counsel of record via the Court's CM/ECF electronic filing system, which will send notification of such filing to:

Brandon E. Slaven

Assistant Attorney General

Torts Division

Office of the Attorney General

P.O. Box 40126

Olympia, WA 98504-0126

Brandon.Slaven@atg.wa.gov

DATED this 31 day of July, 2026.

/s/CAMERON JAMES WILSON

*Plaintiff, Pro Se*

19